IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

NO. 4:18-CR-54-FL

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | |
| | ) | ORDER |
| TERRENCE DENON MILLER, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the court on defendant's motion to suppress (DE 31). Pursuant to 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Criminal Procedure 59(b), United States Magistrate Judge James E. Gates, entered memorandum and recommendation ("M&R"), wherein it is recommended that defendant's motion be denied. Defendant filed objections to the M&R and the government responded. In this posture, the issues raised are ripe for ruling. For the following reasons, defendant's motion to suppress is denied.

## STATEMENT OF THE CASE

On October 3, 2018, defendant was indicted for 1) conspiracy to distribute and possess with the intent to distribute 50 grams or more of methamphetamine and 5 kilograms or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846 and 2) possession with the intent to distribute 50 grams of more of methamphetamine and a quantity of heroin, in violation of 21 U.S.C. § 841(a)(1). Defendant filed the instant motion to suppress May 21, 2019, seeking suppression of all evidence seized as a result of a warrantless search of his residence conducted April 6, 2018, while he was on probation, and a subsequent search of his residence that same day pursuant to a

search warrant. The government responded in opposition, and the magistrate judge held an evidentiary hearing on the motion June 26, 2019.

At hearing, defendant introduced testimony of Joshua Allen Stocks ("Stocks"), a task force officer with the Drug Enforcement Administration ("DEA") and a narcotics investigator with the Wayne County Sheriff's Office, and John Murray ("Murray"), a North Carolina probation officer stationed in Lenoir County. The court also admitted the following exhibits offered by defendant: 1) search warrant for defendant's residence and supporting application, 2) probation violation hearing transcript, and 3) Stocks's investigation report.

In addition, the court admitted the following exhibits offered by the government: 1) letter sent from Murray to counsel for the government; 2) criminal judgment entered against defendant in state court; 3) aerial map of defendant's residence, 4) probation violation report dated January 31, 2017; 5) order on violation of probation dated August 24, 2017; 6) delegated authority and high risk offender form dated June 26, 2017; 7) probation violation report dated July 14, 2017; 8) order on violation of probation dated August 24, 2017; 9) delegated authority and high risk offender form dated September 5, 2017; 10) probation violation report dated October 19, 2017; and 11) probation violation report dated April 6, 2018.

Following the hearing, the magistrate judge invited the parties to file supplemental briefs. The government and defendant submitted their briefs September 6, 2019, and September 27, 2019, respectively. On January 13, 2020, the magistrate judge entered M&R, recommending denial of defendant's motion to suppress. Defendant filed objections February 25, 2020, and the government responded March 9, 2020.

**STATEMENT OF FACTS**

The court incorporates herein by reference the magistrate judge's findings of fact (see M&R (DE 50) at 4-16),[1] where such findings are supported by the testimony and evidence received at evidentiary hearing. The court addresses in the analysis herein specific objections raised by defendant to factual findings in the M&R.

**COURT'S DISCUSSION**

A.   Standard of Review

The district court reviews de novo those portions of a magistrate judge's M&R to which specific objections are filed. 28 U.S.C. § 636(b). The court does not perform a de novo review where a party makes only "general and conclusory objections that do not direct the court to a specific error in the magistrate's proposed findings and recommendations." Orpiano v. Johnson, 687 F.2d 44, 47 (4th Cir. 1982). Absent a specific and timely filed objection, the court reviews only for "clear error," and need not give any explanation for adopting the M&R. Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 315 (4th Cir. 2005); Camby v. Davis, 718 F.2d 198, 200 (4th Cir. 1983). Upon careful review of the record, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

B.   Analysis

In the instant motion to suppress, defendant argues that federal investigation, led by Stocks, prompted the warrantless search of his residence, rather than any probationary concerns, in violation of his rights under the Fourth Amendment.

---

[1]   Page numbers in citations to documents in the record specify the page number designated by the court's electronic case filing (ECF) system, and not the page number, if any, showing on the face of the underlying document.

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. "[S]earches conducted outside the judicial process . . . are per se unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967).

One exception applies where "special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." Griffin v. Wisconsin, 483, U.S. 868, 873 (1987) (internal citation omitted). For example "[a] State's operation of a probation system" presents "special needs" such as the need to ensure that "probation serves as a period of genuine rehabilitation and that the community is not harmed by the probationer's being at large." Id. at 873-74. Accordingly, the United States Supreme Court has held that a warrantless search of a probationer's residence is reasonable under the Fourth Amendment if the search complies with a statute that presents a "reasonable response" to the "special needs" of probation. Id. at 880.

In United States v. Knights, the Supreme Court again considered the reasonableness of a warrantless search of a probationer; however, instead of utilizing the special needs framework set forth in Griffin, the Court inquired whether reasonable suspicion supported the police officer's search. 534 U.S. 112, 121 (2001). Ultimately, the Court held that "[w]hen an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable." Id.

The United States Court of Appeals for the Fourth Circuit has utilized both the special needs framework outlined in Griffin and the reasonable suspicion test set forth in Knights to determine whether a warrantless search of a probationer is reasonable under the Fourth

Amendment. See United States v. Midgette, 478 F.3d 616, 623-25 (4th Cir. 2007). Applying the Griffin framework, the Fourth Circuit first considered whether the following North Carolina statute presents a "reasonable response" to the "special needs" of probation:

> [a probationer must] submit at reasonable times to warrantless searches by a probation officer of her or her person and of his or her vehicle and premises while the probationer is present, for purposes specified by the court and reasonably related to his or her probation supervision, but the probationer may not be required to submit to any other search that would otherwise be unlawful.

N.C. Gen Stat. § 15A-1343(b1)(7). The court held that the statute was a "reasonable response" since it was "narrowly tailored" to promote the state's "need to supervise probationers' compliance with the conditions of their probation in order to promote their rehabilitation and protect the public's safety." Midgette, 478 F.3d at 624.

Next, addressing the second part of the special needs framework, the court considered whether the search at issue complied with N.C. Gen. Stat. § 15A-1343(b1)(7), where police officers participated in the search at the request of the probation officer, who was present during the search and supervised the same. Id. at 625—26. After surveying North Carolina case law, the Fourth Circuit concluded that "police officers may conduct the warrantless search of a probationer—indeed may even suggest the search—so long as the search is authorized and directed by the probation officer." Id. at 626. Thus, the Fourth Circuit concluded that the search complied with N.C. Gen. Stat. § 15A-1343(b1)(7) and was reasonable under Griffin. Id. Finally, as an alternative ruling, the court held that the search was supported by reasonable suspicion and was therefore reasonable under Knights. Id. at 624—25.

Here, the warrantless search of defendant's residence was reasonable under Griffin and Knights, for reasons cogently explained in the M&R, which the court incorporates herein by

5

reference. (See M&R (DE 50) at 24—28). The court writes separately to address defendant's specific objections.

1.   Witness Credibility

First, defendant objects to the magistrate judge's determination that Stocks and Murray are credible witnesses. Upon reaching that determination, the magistrate judge noted "[t]heir recall of events was good, and they answered questions in a straightforward manner." (M&R (DE 50) at 24). Moreover, "[t]heir testimony was materially consistent with statements by them in exhibits of record" and "during cross examination, their responses were factual, not adversarial in tone." (Id.).

Defendant argues, however, that Stocks and Murray are not credible witnesses due to alleged inconsistencies in their testimony. Specifically, defendant points to Stocks's testimony that he set up surveillance of defendant's residence on April 4, 2018, and April 5, 2018, "to observe and determine if there was traffic coming in and out of the residence, determine for safety issues how many people were going to be present at the residence whenever we go do a search." (Tr. 21:4-7). Defendant claims this testimony is contradicted by Murray's testimony that he did not have any fear for his safety when entering defendant's residence (Tr. 63:11-18) and that he did not know if officers had been surveilling defendant's residence prior to the date of the search, April 6, 2020. (Tr. 63:19-22).

However, Murray's testimony does not contradict Stocks's testimony. Although Murray may not have feared for his own safety, he asked Stocks to assist in a search of defendant's residence (Tr. 30:23-31:1); therefore, Stocks had reason independent of Murray to assess possible safety issues prior to the search. Moreover, Stocks was aware that law enforcement found defendant in possession of a firearm during a traffic stop of defendant's vehicle in June 2017. (Tr.

33:13-16). Given defendant's possession of a firearm in the past, Stocks's safety concerns prior to the search were reasonable.

Likewise, Murray's testimony that he did not know officers were surveilling defendant's residence on April 4, 2018, and April 5, 2018, does not contradict Stocks's testimony indicating that such surveillance occurred. At that time, Stocks was a task force officer with the DEA, and he worked for the Lenoir County Sheriff's Office (Tr. 9: 21-24), while Murray was a probation officer for the State of North Carolina. (Tr. 41:21-22). Since they worked for different agencies, it is reasonable that Murray would not know the details of Stocks's day to day operations.

Defendant also argues Murray contradicted his own testimony that he did not know officers were surveilling defendant's residence on April 4, 2018, and April 5, 2018, by later acknowledging that he used a "call word" to instruct Stocks to enter defendant's residence on April 6, 2018, which he gave over the radio. (See Def. Obj. (DE 59) at 4; Tr. 61:17-24). However, Murray testified that he met with Stocks at 8:00 a.m. on April 6, 2018, at a fire department approximately two-tenths of a mile from defendant's residence. (Tr. 60:1-22). During their meeting, Murray told Stocks that he needed to go to defendant's residence first, and he would call Stocks as soon as he was inside. (Tr. 60:23-61:1). Accordingly, Murray knew Stocks was surveilling defendant's residence on the morning of April 6, 2018, because Murray met with Stocks earlier that morning. Where Murray did not meet with Stocks on April 4, 2018, or April 5, 2018, it is reasonable that he was unaware of Stocks's surveillance on those dates.

Finally, defendant argues that Murray's testimony "diminished the role, presence, and communication with law enforcement." (Def. Obj. (DE 59) at 5). Yet, Murray testified that throughout the course of defendant's probation, he informed law enforcement whenever he suspected defendant was engaged in certain activities (Tr. 46:16-47:9; 54:2-11; 120:2-5), and that

7

law enforcement assisted Murray during previous searches of defendant's residence (Tr. 48:18-49:17). Therefore, Murray did not "diminish" his communication and association with law enforcement.

Upon de novo review, having found no inconsistencies between Stocks's and Murray's testimony, and where the record and evidence presented at hearing otherwise supports the magistrate judge's credibility determination, the court adopts the magistrate judge's finding that Stocks and Murray are credible witnesses.

2. Probation Supervision

Next, defendant objects to the magistrate judge's determination that the warrantless search of defendant's residence was "directly related" to probation supervision, as required by N.C. Gen. Stat. § 15A-1343(b)(13).

In 2009, the North Carolina General Assembly amended the probationer supervision statute, requiring searches of probationers to be "directly related" as opposed to "reasonably related" to probation supervision. See N.C. Gen. Stat. § 15A-1343(b)(13) ("[A probationer must] [s]ubmit at reasonable times to warrantless searches by a probation officer of the probationer's person and of the probationer's vehicle and premises while the probationer is present, for purposes directly related to the probation supervision, but the probationer may not be required to submit to any other search that would otherwise be unlawful.") (emphasis added); c.f. N.C. Gen. Stat. § 15A-1343(b1)(7) (revoked effective 1 Dec. 2009) ("[A probationer must] submit at reasonable times to warrantless searches by a probation officer of his or her person and of his or her vehicle and premises while the probationer is present, for purposes specified by the court and reasonably related to his or her probation supervision, but the probationer may not be required to submit to any other search that would otherwise be unlawful.") (emphasis added).

8

In State v. Powell, a North Carolina state court addressed the General Assembly's amendment to the probation statute for the first time. 253 N.C. App. 590, 599 (2017). Interpreting the amended language, the court stated:

> The General Assembly did not define the phrase "directly related" in its 2009 amendment to N.C. Gen. Stat. § 15A-1343(b)(13). It is well established that where words contained in a statute are not defined therein, it is appropriate to examine the plain meaning of the words in question absent any indication that the legislature intended for a technical definition to be applied.
>
> The word "directly" has been defined as in unmistakable terms. "Reasonable" is defined, in pertinent part, as "being or remaining within the bounds of reason." When the General Assembly amends a statute, the presumption is that the legislature intended to change the law. Thus, we infer that by amending subsection (b)(13) in this fashion, the General Assembly intended to impose a <u>higher</u> burden on the State in attempting to justify a warrantless search of a probationer's home than that existing under the former language of this statutory provision.

Powell, 253 N.C. App. at 599—600 (internal quotations and citations omitted) (emphasis in original). Despite concluding that the amended statute imposed a "higher" burden on the State, the North Carolina Court of Appeals clarified that Powell "should not be construed as diminishing any of the authority conferred upon probation officers by N.C. Gen. Stat. § 15A-1343(b)(13) to conduct warrantless searches of probationers' homes or to utilize the assistance of law enforcement officers in conducting such searches." 253 N.C. App. at 605.

Here, to support his contention that the search was not "directly related" to probation supervision, defendant argues Stocks's surveillance of defendant's residence prompted the search, instead of any concerns regarding probation. (See Def. Obj. (DE 59) at 6). However, Stocks's and Murray's testimony, which the court finds credible, refutes defendant's argument. Indeed, according to Murray's and Stocks's testimony, Murray approached Stocks, stating that he wanted to search defendant's residence and requesting law enforcement assistance; thereafter, in

9

preparation for the impending search, Stocks set up surveillance of defendant's residence on April 4, 2018. (Tr. 31:15-20; 58:3-9; 118:23-35).

Moreover, Murray's interest in conducting the search stemmed from his observation of certain drug trafficking behaviors during the course of defendant's probation. For instance, according to defendant's electronic monitoring device, defendant frequently drove to convenience stores and department stores, and remained the parking lot. (Tr. 90:20-91:7). Sometimes he would meet at different locations within the same parking lot. (Tr. 91:8-12). Defendant also frequented an "old-style garage" that was owned by a cocaine and methamphetamine supplier. (Tr. 91:13-25). Whenever he visited that garage, he would take a different route on the way home. (Tr. 92:5-12).

Likewise, Murray observed frequent visitors at defendant's residence. (Tr. 89:12-18). When Murray asked defendant who these people were, defendant always said they were his cousin or his brother. (Tr. 89:19-25). However, upon researching the visitors' license plates, Murray found inconsistencies between the vehicles' owners and the names defendant provided him. (Tr. 90:3-19).

Moreover, during home visits, Murray noticed a BMW and a Mercedes outside of defendant's residence. (Tr. 109:12-17; 110:8-16). Although defendant first claimed that his brother, who was in the military, owned the BMW, he later admitted to owning both vehicles. (Tr. 109:18-110:24). Yet, defendant was not employed and never explained how he was able to afford these luxury vehicles without a job. (Tr. 110:25-111:2).

Then, on March 13, 2018, defendant's girlfriend Tiesha Brown ("Brown"), showed Murray where defendant hid drugs in his house. (Tr. 114:7-115:14). And finally, just two days prior to the warrantless search at issue, Murray visited defendant's residence and noticed a vehicle parked

outside with its engine running. (Tr. 119:1-4). When Murray entered defendant's house, he asked defendant who was outside. (Tr. 119:12). Defendant told him it was someone named Martin. (Tr. 119:10-11). In response, Murray asked defendant "well, who's in the house?" and defendant replied, "somebody named Mark." (Tr. 119:13-14). Next, Murray heard the toilet being flushed, and he suspected that the person was "flushing whatever he had if a drug deal was going on." (Tr. 119:22-120:1). After leaving defendant's residence, Murray discovered that the car was not registered to anyone named Mark and believed that he had interrupted a drug transaction. (Tr. 120:8-20).

In light of the above observations, Murray suspected defendant was engaged in drug trafficking, in violation of his probation, and decided to search his residence. Other probationary concerns, such as Murray's need to inspect the "beacon" on defendant's electronic monitoring device, and Murray's need to question defendant about a pending charge in Craven County for allowing an unauthorized person to drive, also motivated the search. (Tr. 61:12-16).

Further illustrating the direct relation of the search to probation, Murray, rather than Stocks, controlled the logistics of the search. For example, law enforcement suggested searching defendant when he left his residence. (Tr. 137:3-5). However, Murray rejected this proposal and stated that instead, he would conduct a search inside defendant's house and then summon law enforcement for back up. (Tr. 137:6-13). Ultimately, the search was conducted pursuant to Murray's instruction. (Tr. 60:25-62:13).

Accordingly, despite law enforcement's participation in the warrantless search, the search was directly related to defendant's probation supervision. See Midgette, 478 F.3d at 626 ("[P]olice officers may conduct the warrantless search of a probationer—indeed may even suggest the search—so long as the search is authorized and directed by the probation officer."); see also

11

Powell, 253 N.C. App. at 605 ("[This case] should not be construed as diminishing any of the authority conferred upon probation officers by N.C. Gen. Stat. § 15A-1343(b)(13) to conduct warrantless searches of probationers' homes or to utilize the assistance of law enforcement officers in conducting such searches.").

3.   Reasonable Suspicion

Lastly, defendant objects to the magistrate judge's determination that the search was supported by reasonable suspicion as required by Knights.[2] "Reasonable suspicion requires a particularized and objective basis for suspecting the person searched of criminal activity." Midgette, 478 F.3d at 625 (citing Ornelas v. United States, 517 U.S. 690, 696 (1996)). This standard is "a less demanding standard than probable cause and requires a showing considerably less demanding than preponderance of the evidence." Id. (citing Illinois v. Wardlow, 528 U.S. 119, 123 (2000)). In fact, "[r]easonable suspicion may be based simply upon a tip that has some particular indicia of reliability." Id. (citing United States v. Perkins, 363 F.3d 317, 324—26 (4th Cir. 2004)). For example, "in Griffin, the Court noted that a tip received by a detective that there were or might be guns in the probationer's apartment provided the probation office with reasonable suspicion." Id. (citing 483 U.S. at 871).

Here, in light of the frequent visitors at defendant's home (Tr. 89:12-18), and defendant's attempt to conceal those visitors' identities (Tr. 89:12-90:19), defendant's tendency to meet people in parking lots (Tr. 90:20-91:7), defendant's presence at a garage owned by a drug dealer (Tr. 91:13-25), and his inconsistent departure routes therefrom (Tr. 92:5-12), defendant's ownership of

---

[2]   Defendant also objects to the magistrate judge's determination that the search satisfied the special needs framework set forth in Griffin. In support, defendant argues the search was not "directly related" to probation supervision and thus did not comply with N.C. Gen. Stat. § 15A-1343(b)(13). However, the court already rejected this argument in response to defendant's second objection.

luxury vehicles despite being unemployed (Tr. 110:25-111:2), information provided by defendant's girlfriend that defendant stored drugs in his home (Tr. 114:7-115:14), and Murray's suspicion that he interrupted a drug transaction at defendant's home (Tr. 120:8-20), Murray had reasonable suspicion that defendant was engaged in drug trafficking. Accordingly, the warrantless search of defendant's residence was reasonable. See Knights, 534 U.S. at 121 ("When an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable.").

**CONCLUSION**

Based on the foregoing, upon de novo review of those portions of the M&R to which specific objections were raised, and considered review of the remainder thereof, the court ADOPTS as its own the findings and recommendations of the magistrate judge (DE 50) and DENIES defendant's motion to suppress. (DE 31). An order scheduling arraignment will follow.

SO ORDERED, this the 6th day of April, 2020.

_____
LOUISE W. FLANAGAN
United States District Judge